UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL and SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, and LOCAL 9550, | ) ) ) ) ) ) ) | |
| Plaintiffs | ) ) ) | |
| vs. | ) ) | CAUSE NO. 3:12-CV-713 RLM |
| CEQUENT TOWING PRODUCTS, | ) ) | |
| Defendant | ) | |

<u>OPINION and ORDER</u>

The plaintiff labor unions represent workers at the Goshen, Indiana, plant of Cequent Performance Products, Inc., f/k/a Cequent Towing Products. The Unions filed suit in this court seeking a status quo injunction to prevent Cequent from moving its Goshen operations to Reynosa, Mexico, until the parties can arbitrate the issue of whether Cequent's move to Mexico is a violation of the parties' collective bargaining agreement. The court held a hearing on January 17, 2013 on the Unions' motion for preliminary injunction and Cequent's motions to cancel the hearing and to dismiss the complaint. The court denied Cequent's motions to cancel and to dismiss and took the Unions' motion under advisement.

Having considered the parties' oral arguments and written submissions, the court denies the Unions' motion for preliminary injunction.

## I. Background

The parties don't dispute the facts surrounding their dispute. The Unions represent some 375 production and maintenance workers at Cequent's Goshen facility where workers manufacture trailer hitches for sale to automobile manufacturers and after-market suppliers. Cequent is owned by TriMas Corporation, which has plants world-wide and is headquartered just outside Detroit. The applicable collective bargaining agreement between Cequent and the Unions covers the period March 13, 2011 to March 12, 2014. Compl., Exh. A.

On October 18, 2012, Thomas Benson, Cequent's President, sent a letter to Union representatives informing them that "after serious consideration and analysis, management at TriMas Corporation, parent company of Cequent Performance Products, has made the preliminary recommendation to close our Goshen, Indiana plant and to relocate the operations and work performed at the Cequent-owned facility in Reynosa, Mexico. . . . We would like to emphasize that no final decision has been made at this point. However, TriMas plans to reach a final decision on or soon after November 19, 2012. Accordingly, any information and/or input from the United Steel Workers that the Union believes should be considered prior to TriMas reaching a final decision should be provided sufficiently

in advance of November 19, 2012, so that we may consider all such information and input prior to reaching a final decision." Compl., Exh. B.

The day after receiving Mr. Benson's letter, the Unions filed a grievance on behalf of "all Cequent employees plant wide" complaining about the company's plans to "shut down the Goshen plant and out source the work to Mexico" and asking that Cequent "make all employees whole in all aspects plant wide;" Cequent denied that grievance on October 23 based on its conclusion that the grievance "fail[ed] to allege that any provision of the CBA was violated. Regardless, no violation exists under the CBA and the grievance is denied in its entirety." Compl., Exh. C.

The Unions' bargaining team met with Cequent officials on October 30 to discuss the planned move. At the meeting, union representatives asked Cequent to stop moving component parts and equipment out of the plant until the bargaining process ended, and, on November 1, the Unions sent a follow-up letter to Cequent management reiterating their request that the company "cease and desist" moving equipment, tools, etc. until resolution of the Unions' grievance. Compl., Exh. E. The Unions report that Cequent said the parts in question weren't connected with the proposed closure.

The Unions filed an amended grievance with Cequent on November 5, again on behalf of all employees plant wide, alleging company violations of specific provisions of the CBA. Compl., Exh. D. In denying that grievance, Cequent stated

that no violation of the CBA had occurred and the dispute relating to closure of the Goshen facility wasn't subject to arbitration. O'Brien Dec., Exh. 6. The Unions then requested that the company proceed to arbitration on the amended grievance.

On November 8, the Unions filed their complaint in this court under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185(a), asking that Cequent (i) be ordered to proceed to arbitration on the Unions' grievance relating to closure of the Goshen facility and (ii) be enjoined from closing the Goshen plant during the pendency of the arbitration. Cequent moved to dismiss, the Unions filed their response, and the Unions moved for injunctive relief seeking to preserve the status quo pending arbitration.

Shortly before the preliminary injunction hearing, Cequent informed the court that the company had agreed to proceed to arbitration on the Unions' grievance. In Cequent's notice to the court of the parties' agreement, the company reiterated that its Goshen facility isn't "scheduled to close permanently until the end of 2013 and no employees will be let go until February 22, 2013, more than half will remain employed through the end of June 2013, and the last will remain until December 20, 2013," which Cequent said demonstrated that "it is now indisputable that [the Unions] are not facing any actual or threatened irreparable harm and there is no basis for this lawsuit. " Deft. Notice of Supp. Evidence, ¶¶ 4, 9-10. Cequent concluded that subject matter jurisdiction was lacking so the

4

complaint should be dismissed and the preliminary injunction hearing cancelled. Deft. Notice of Supp. Evidence, ¶¶ 14, 15. The Unions objected to canceling the hearing based on their claim that evidence at the hearing would "show that the Union does indeed face an irreparable injury justifying an injunction in aid of arbitration." Pltfs. Resp. to Notice, at 1.

The parties' dispute relates to the following provisions of the applicable CBA:

### Article 2 – Management Rights

Subject to the terms of this Agreement, [Cequent] has and shall continue to have full and complete control over matters relating to the management and conduct of its business, the direction of the workforce and the planning and processing and the determining of methods of operations. . . . [Cequent] also retains the right to close, discontinue, or relocate all or any part of the operations or work performed in Goshen, Indiana for any lawful reason subject to any bargaining obligation imposed under federal law.

### Article 9 – Grievance Procedure

Section 1. Grievances Generally. Should any grievance, disputes, or complaints arise over the interpretation or application of the Agreement, there shall be an earnest effort on the part of the parties to arrange a settlement promptly through the Grievance Procedure. Grievances shall be processed as follows:

\*   \*   \*

Step 4: If the grievance is not settled in Step 3, and where the Union representative may indicate his desire in writing . . . to appeal the grievance to Arbitration[,] [t]he parties shall then select an arbitrator in accordance with the Rules and Procedures of the Federal Mediation and Conciliation Service who shall be a member of the National Academy of Arbitrators. The arbitrator shall have no authority or jurisdiction to add to, detract from, or alter the terms and conditions of the Agreement. The decision of the arbitrator, within the limits herein prescribed, shall be final and binding on both parties to the dispute.

**Article 27 – Contracting Out**

[Cequent] is committed to having bargaining unit employees perform available work, however, recognizing that business strategies and/or conditions could warrant the subcontracting of work, the following will apply:

Before [Cequent] finally decides to contract out any work, it shall notify the Unit President in writing as to the nature and scope of the work and the reasons for contracting out. Such notice shall be given in sufficient time to permit the Union to meet with management and offer alternative suggestions to contracting out before the contract is let, unless business conditions prevent it. Management shall give full consideration to any suggestions by the Union for performance of work by bargaining unit employees.

During periods of layoffs or reduced hours [Cequent] shall not contract or outsource work customarily performed by the bargaining unit, provided the work can be performed by those employees.

Compl., Exh. A.

The Unions characterize Cequent's planned move to Mexico as outsourcing, an action they claim violates Article 27 of the CBA. The Unions say the company's plan to move production work from Goshen violates Article 27's prohibition on the contracting or outsourcing of work customarily performed in Goshen because that action will cause layoffs or reduce the work available to the Goshen work force. Cequent characterizes its action as a closure and relocation governed by Article 2 of the CBA. According to Cequent, Article 2 clearly reserves the right of management to "close, discontinue, or relocate all or any part of the operations or work performed in Goshen, Indiana for any lawful reason."

The Unions further claim that the parties' dispute is subject to the arbitration provisions of Article 9 and ask the court to declare the matter arbitrable and enjoin Cequent from implementing any move until arbitration of the

issue is complete so an arbitrator can render a meaningful remedy. Even though Cequent argued in its motion to dismiss and its response to the motion for preliminary injunction that the matter isn't arbitrable or, at a minimum, arbitration would be futile, the parties are proceeding with arbitration.

The court's jurisdiction over this matter is based on § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

## II. DISCUSSION

Under the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115, federal courts are strictly limited in their ability to enjoin labor disputes.[1] The Supreme Court created a narrow exception to the Act's anti-injunction prohibition in Boys Markets, Inc. v. Retail Clerks Union Local 770, 398 U.S. 235 (1970), holding that a court can issue an injunctive order if the court first determines that the contract has the effect of binding both parties to arbitrate the dispute at issue and ordinary principles of equity would warrant an injunction. 398 U.S. at 254 (adopting Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 228 (1962) (Brennan, J., dissenting)); see also Chicago Dist. Council of Carpenters Pension Fund v. K & I Constr., Inc., 270 F.3d 1060, 1064 (7th Cir. 2001) (A plaintiff seeking an injunction in a labor dispute "is subject to an extra burden:  it must both satisfy

---

[1] 29 U.S.C. § 101 states that "[n]o court of the United States . . . shall have jurisdiction to issue any restraining order or temporary injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of [the Act]." Section 113(c) explains that the term " 'labor dispute' includes any controversy concerning terms or conditions of employment."

the normal requirements for an injunction and demonstrate that the contract language binds the [defendant] to arbitrate the dispute."). Thus, "[t]o establish that enjoining an employer's conduct is necessary to ensure that the arbitral process will not be frustrated, the party seeking the injunction must first prove that the underlying dispute is arbitrable[, and] second, it must prove that the traditional requirements of injunctive relief support the award: (1) the likelihood of success on the merits, (2) whether irreparable injury is present or threatened, and (3) balancing the respective hardship on the parties if the injunction is granted." United Steel Workers of America, AFL-CIO-CLC v. Cooper-Standard Automotive of Bowling Green, OH, No. 1:04-CV-358, 2004 WL 2599132, at *3 (N.D. Ind. Nov. 2, 2004)  (citing Boys Markets v. Retail Clerks Local 770, 398 U.S. at 254).

## A. Question of Arbitrability

"Whether a particular claim is arbitrable depends not upon the characterization of the claim, but upon the relationship of the claim to the subject matter of the arbitration clause." Gore v. Alltel Communications, LLC, 666 F.3d 1027, 1036 (7th Cir. 2012). Article 9 of the parties' CBA sets forth grievance and binding arbitration procedures for all "grievances, disputes, or complaints [that] arise over the interpretation or application of the [CBA]." The Unions' grievance,

which involves a dispute over the interpretation or application of the CBA, relates directly to the subject matter of the arbitration clause.

Too, the use of "arising out of or relating to" language in a CBA has been characterized as being "extremely broad and capable of an expansive reach. Such broad language necessarily create[s] a presumption of arbitrability . . . [and] should be resolved in favor of arbitration." Gore v. Alltel Communications, 666 F.3d at 1034 (internal quotations and citations omitted); *see also* Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n, 713 F. Supp. 2d 734, 739 (N.D. Ill. 2010) ("The Seventh Circuit has held that arbitration clauses that contain ['arising out of or relating to'] language are 'broad' and 'necessarily create a presumption of arbitrability.'") (*quoting* Keifer Specialty Flooring, Inc. v. Tarkett, 174 F.3d 907, 910 (7th Cir. 1999)). As just noted, the arbitration clause of the parties' CBA is applicable to disputes or complaints that "arise over the interpretation or application" of the agreement. The parties' dispute — whether Article 2 or Article 27 of the CBA applies to Cequent's plan to move its operations to Mexico — "arises over the interpretation or application of" the terms of the CBA.

The court concludes, as it did at the January 17 hearing, that the dispute here at issue falls within the subject matter of the arbitration clause and is, therefore, subject to arbitration. *See* United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-583 (1960) ("An order to arbitrate the

particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.").

### B. Reasonable Likelihood of Success

To show a likelihood of success on the merits at the preliminary injunction stage, a plaintiff need only show "'a better than negligible chance of succeeding.'" Cooper v. Salazar, 196 F.3d 821, 813 (7th Cir. 1999) (*quoting* Boucher v. School Bd. of Greenfield, 134 F.3d 821, 8254 (7th Cir. 1998)). "Satisfaction of this requirement depends upon whether the unions' claims raise 'sufficiently genuine disputes' to support a status quo injunction. In making this determination, the court is mindful that contract interpretation is not the function of the court, but is for the arbitrator." Local 715, United Rubber, Cork, Linoleum and Plastic Workers of America v. Michelin American Small Tire, 840 F. Supp. 598, 602 (N.D. Ind. 1993); *see also* General Drivers and Dairy Employees, Local No. 563 v. Bake Rite Baking Co., 580 F. Supp. 426, 431 (E.D. Wis. 1984) ("[T]he union need only show that there is a genuine dispute to be arbitrated that is sufficiently sound. To delve further and prognosticate the likely result of the arbitral process would be to intrude significantly on the arbitrator's function.").

In the context of a reverse Boys Market injunction, the Unions must establish that "the position [they] will espouse in arbitration is sufficiently sound

to prevent the arbitration from being futile. If there is a genuine dispute with respect to an arbitrable issue, the barrier (to the issuance of an injunction) . . . has been cleared." Local Lodge No. 1266, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Panoramic Corp., 668 F.2d 276, 284-285 (7th Cir. 1981). Based on the court's conclusion that the Unions have demonstrated a genuine dispute relating to the terms of the CBA that is subject to arbitration, the court finds that the Unions have demonstrated at least a negligible chance of succeeding at arbitration on the merits of their position.

## C. No Adequate Remedy at Law and Irreparable Harm

The next factors necessary for entry of a preliminary injunction are a lack of adequate remedy at law and a showing that irreparable harm will result if the injunction isn't granted. Lambert v. Buss, 498 F.3d 446, 451 (7th Cir. 2007). "Irreparable injury means not simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award, but rather 'injury so irreparable that a decision of the (arbitration) board in the union[s'] favor would be but an empty victory.'" Local Lodge No. 1266 v. Panoramic Corp., 668 F.2d at 285-286 (quoting Brotherhood of Locomotive Eng'rs v. Missouri-Kansas-Texas R.R., 363 U.S. 528, 534 (1960)). Thus, a status quo injunction "in aid of arbitration is appropriate [] only when the actual or threatened harm to the

11

aggrieved party amounts to a frustration or vitiation of arbitration." Local Lodge No. 1266 v. Panoramic Corp., 668 F.2d at 286.

The Unions say they have established irreparable harm based on the following four considerations, addressed separately below.

1.

The Unions first note that Cequent already has moved machinery to Mexico. They presented testimony at the hearing from Michael Hanna, a Cequent employee who said that metal cutters, lasers, saws, presses, lasers, and an overhead crane had been removed from the Goshen plant, actions which, Mr. Hanna said, necessitated certain employees being reassigned to different jobs.

Cequent says the moving of equipment has been very minimal, as evidenced by the testimony of Rich Brown, Goshen plant manager, who said that only six pieces of equipment have been removed from the plant, with the next transfer not due to take place until March. Cequent also presented evidence that its removal of that equipment hasn't resulted in any layoffs of employees. Mr. Brown represented that even though some equipment had been moved, production at the Goshen plant continues, a fact confirmed by Michael Hanna, who testified that even the employees who had been reassigned still had work to do every day.

The Unions haven't demonstrated how Cequent's removal of minimal amounts of equipment or machinery from the Goshen plant would frustrate the

arbitration process or amount to irreparable harm that couldn't be redressed through an arbitration award. Local 715, United Rubber, Cork, Linoleum and Plastic Workers of America v. Michelin America Small Tire, 840 F. Supp. 598, 604 (N.D. Ind. 1993) ("Should Michelin not be enjoined from removing this equipment, the disruption at the plant will be minimal and the loss of jobs related to the equipment removal is merely speculative."); see also East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co., 414 F.3d 700, 705-706 (7th Cir. 2005) ("a plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries").

2.

The Unions say Cequent already is considering a sublease of the Goshen facility. Union witness Michael Hanna testified that he "heard rumors" that another company was interested in subleasing Cequent's Goshen facility, and he observed officials from another Goshen business conducting a walk-through of the Cequent plant.

Cequent presented testimony from chief operating officer Michael Finos that Cequent would not enter into any sublease while the arbitration is on-going. He said, too, that even though a Goshen business is interested in subleasing the facility, that company doesn't need the space until the end of the year, which coincides with Cequent's current plans.

13

The Unions haven't challenged Mr. Finos's statement that Cequent won't be entering into any sublease during the pendency of the arbitration, nor have they explained how Cequent's plans to sublease the Goshen facility after the arbitration process has concluded would frustrate that process or amount to irreparable harm. *See* Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.").

### 3.

The Unions say lengthy legal proceedings will make it difficult and costly for Cequent to "unscramble the eggs" and reestablish the Goshen facility if ordered to do so. The Unions say that if the arbitrator decides in their favor and determines that Cequent must remain open or reopen, employees might already have lost their jobs and moved on with their lives, so reinstatement and determination of the amounts of back pay due would be difficult.

Cequent represented at the preliminary injunction hearing that it was working with union representatives to select an arbitrator and proceed to arbitration in a timely manner. "[I]f the union wins in arbitration, [Cequent] will have the power to reinstate any employees should an arbitrator order this relief." Local 715, United Rubber, Cork, Linoleum and Plastic Workers of America v.

Michelin America Small Tire, 840 F. Supp. 598, 604 (N.D. Ind. 1993). Even if the arbitration process extends beyond the December 2013 closure of the plant, the Unions haven't demonstrated that a monetary award would be insufficient or impossible to calculate: that Cequent might find it difficult and costly to determine precise amounts of moneys due and owing to former employees isn't evidence that money damages couldn't fully redress an arbitral award in favor of the Unions.

Because an arbitration award in this case can consist of monetary damages, a reopening of the plant, reinstatement of employees, or a combination of those remedies, the Unions haven't demonstrated irreparable harm sufficient to justify entry of injunctive relief.

4.

Lastly, the Unions reiterate that Cequent's transfer of work to Mexico will lead to the permanent loss of employment for several hundred Goshen workers. The Unions say "courts have often held that the permanent loss of employment constitutes irreparable harm," Pltfs. Memo., at 8, and cite in support Local Lodge No. 1266, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Panoramic Corp., 668 F.2d 276 (7th Cir. 1981), and Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079 (7th Cir. 2008), in which, the Unions note, the court quoted Panoramic with approval.

The facts justifying the findings of irreparable harm in those cases are distinguishable. The Panoramic plant was to be sold to a third party within a week of the union's complaint being filed. In contrast, Cequent presented testimony at the preliminary injunction hearing that it plans to continue production and not close the Goshen plant until December 2013. Rich Brown, manager of the Goshen facility, testified that Cequent's move involves a year-long plan: the first lay-offs will take place at the end of February, the work force will be down to half after July, and the plant will remain open and operating until December. "Therefore, the present situation is far different from the cases cited by the union[s] wherein the loss of jobs was in fact permanent because the plant was going to be sold or closed immediately." Local 715, United Rubber, Cork, Linoleum and Plastic Workers of America v. Michelin America Small Tire, 840 F. Supp. 598, 604 (N.D. Ind. 1993).

And while the court in Girl Scouts determined that money damages for the plaintiff would be insufficient, that conclusion was coupled with the court's finding that the plaintiff would also suffer "the potential loss of institutional knowledge," a loss of real property, and damage to its goodwill. 549 F.3d at 1095. In contrast, the Unions haven't argued or alleged that any job losses will be accompanied by the loss of institutional knowledge, real property, or goodwill. *Cf.* Chauffeurs, Teamsters and Helpers Local Union No. 414 v. Food Marketing Corp., No F 86-317, 1986 WL 15724, at *7 (N.D. Ind. Oct. 3, 1986) ("[S]everal employees

testified as to the effects of [the defendant's] termination of health and welfare coverage. This evidence indicated that persons who had been covered under the terminated plan were foregoing medical treatment for various conditions because of the cutoff of coverage. . . . This is not the kind of harm that can be redressed by any subsequent arbitration award that might include retroactive coverage, and clearly constitutes injury so irreparable that a decision of the [arbitration] board . . . would be but an empty victory.").

As already discussed, Cequent has agreed to proceed to arbitration in a timely manner, and the Unions' reliance on Cequent's minimal moving of equipment, plans for a sublease at the end of the year, and difficulty in reestablishing the work force doesn't establish injuries that can't be fully addressed by an arbitration award or amount to a showing that the arbitration process will be frustrated. Because "[a] permanent loss of employment, standing alone, does not equate to irreparable harm," East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co., 414 F.3d 700, 704 (7th Cir. 2005), the court concludes that the Unions haven't demonstrated irreparable harm that would justify imposition of a Boys Market injunction.

*D. Balance of Hardships*

"The final equitable prerequisite to the issuance of a status quo injunction is a finding that the union will suffer more from the denial of an injunction than will the employer from its issuance." Local Lodge No. 1266, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Panoramic Corp., 668 F.2d 276, 288 (7th Cir. 1981). The focus is on the hardship to the Unions should the injunction not issue. Local 715, United Rubber, Cork, Linoleum and Plastic Workers of America v. Michelin America Small Tire, 840 F. Supp. 598, 605 (N.D. Ind. 1993).

The Unions maintain the Goshen facility is a profitable concern for Cequent so continuing to operate the plant won't harm Cequent; on the other hand, lay-offs will begin in February, and, by the end of 2013, all employees of Cequent will have lost their jobs, so the Unions will suffer the greater hardship. The Unions assert that the balance of hardships — 300+ employees who will lose good jobs vs. lower profits than big companies like Cequent and TriMas desire — tips in favor of the Unions.

Cequent chief operating officer Michael Finos testified that while the Goshen plant is still making money (it's "above break even," with some product divisions showing a profit and some not), production at the plant has been down over the last ten years and fixed costs have gone up, which has had a major impact on the company's profit margins and has caused the cost of the products to rise; higher

18

product costs have made it more difficult for the company to acquire new customers. According to Mr. Finos, if the company had to keep the Goshen plant open, Cequent would incur expenses estimated at $400,000 per month, which includes labor obligations in Mexico. Mr. Finos also reported that Cequent is close to establishing a new distribution center in Texas, so a delay in that transaction and/or the move to Mexico would result in a loss to the company. Mr. Finos opined, too, that if Cequent's move gets delayed, the tenant currently interested in subleasing the property would probably not be interested in the building.

The Unions have shown that they may suffer a loss of jobs before the arbitration process is concluded if the injunction isn't issued, and Cequent has shown that it would incur additional expenses if its moving schedule is stayed or delayed. The Unions haven't carried their burden of establishing a hardship sufficient to tip the balance of hardships in their favor.

### E. Public Interest

Another factor considered in conjunction with a preliminary injunction is the public interest, "which is the effect that granting or denying the injunction will have on nonparties." Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1121 (7th Cir. 1997); *see also* Platinum Home Mortg. v. Platinum Fin. Group, 149 F.3d 722, 726 (7th Cir. 1998) (party seeking preliminary injunction

19

must demonstrate that "the preliminary injunction will not harm the public interest").

The public interest factor generally isn't one of the elements for consideration in a <u>Boys Market</u> injunction case, but the Unions presented the testimony of Allen Kauffman, Mayor of Goshen, Indiana, in favor of a finding that the public interest would suffer if the injunction isn't entered. Mayor Kauffman testified that the loss of jobs resulting from closure of Cequent's Goshen plant would increase the City's unemployment rate, decrease the moneys available to the City of Goshen and Elkhart County from the loss of local option income taxes, economic development taxes, and property taxes, and negatively effect the local business communities. Cequent didn't challenge the Mayor's conclusions in this regard.

The court agrees that the public interest will be negatively affected when Cequent closes its doors in Goshen, but the Unions haven't shown how this consideration would frustrate the arbitration process in which the parties are currently engaging.

III. CONCLUSION

The court sympathizes with the Union members who may be laid off and/or ultimately lose their jobs in Goshen, but must conclude that the Unions haven't established the irreparable harm or balance of hardships necessary to support the

entry of a status quo injunction. For the reasons set forth above, the court DENIES the Unions' motion for preliminary injunction and/or temporary relief [docket # 9].

SO ORDERED.

ENTERED:   __January 30, 2013__

                       __/s/ Robert L. Miller, Jr._____
                       Judge, United States District Court